STATE OF IOWA, Appellee, v. CHARLES ALBERT et al.,
Appellants.

ARSON: Conviction—Insufficiency of Evidence. Evidence which, at best, does no more than excite a grave suspicion of guilt is insufficient to support a judgment of conviction. So held as to a charge of arson.

*Appeal from Appanoose District Court.*—C. W. VERMILION, Judge.

FRIDAY, MAY 5, 1916.

PROSECUTION for alleged arson, in that the defendants caused to be burned certain stock and fixtures of one Allie Joseph, with the intent thereby to injure the insurer of such property. There was a verdict of guilty, and defendants have appealed.—*Reversed* and *Remanded.*

*George Cosson,* Attorney General, *W. B. Hays,* County Attorney, and *H. E. Valentine,* Assistant Counsel, for appellee.

*T. G. Fee,* and *Howell, Elgin & Howell,* for appellant.

EVANS, C. J.—The two defendants, Charles Albert and George Seid, were indicted jointly with Allie Joseph, the alleged owner of the burned property. Separate trial was ordered as to Allie Joseph, and these two defendants were tried jointly. The fire in question occurred at Centerville, at 3:10 A. M., Wednesday, December 9, 1914. For some time prior to the fire, Allie Joseph had occupied as lessee a certain business building on one of the main streets of Centerville. His place of business was known as the West Side Candy Kitchen. He had therein certain fixtures and machinery and stock, all of which was burned in the fire involved herein. The appellants herein, Charles Albert and George Seid, were his employees, and were in immediate charge of this particular business. Joseph himself personally conducted another store, about half a block distant. All three parties are Greeks. The fire was suspicious and mysterious, in that its cause and point of origin have never been ascertained. Albert and Seid, the appellants, had sleeping quarters in the building and occupied the same ·that night. They retired

shortly before midnight, and claimed to have been awakened shortly after three o'clock by the smoke which came into their room.   They rushed out through the back part of the building, carrying with them a part of their clothing, which they donned after getting outside.   One of them ran to the firehouse to give the alarm, and the other ran around in front of the building and "hollered" loudly for help.

The theory put forward by the State is that the property was over-insured and that it was intentionally burned by Joseph, with the aid of these appellants, for the purpose of recovering the insurance thereon.   The evidence introduced to sustain this theory is wholly circumstantial, and the big question in the case is whether it is sufficient to sustain the verdict of guilty.   Joseph himself was not in the city at the time of the fire, but was and had been for a day or more in the city of Albia.   The State introduced evidence tending to show that the property was insured for $1,600, and that its actual value was $200 or $300.   The evidence of the State, however, is very indefinite and doubtful as to the value of the property, and there is considerable evidence to the contrary. Nor does it appear that these appellants knew of the insurance or of the amount thereof.   They were mere employees of Joseph, working for wages, and do not appear to have had any ownership in the property or in the insurance thereon.

The other circumstances relied on by the State consist of the conduct of these appellants, as observed by other witnesses, immediately after the fire was discovered, and the fact that, at the time of the fire, a smell of gasoline was observed by some of the bystanders.   So far as the conduct of these appellants immediately following the discovery of the fire is concerned, we find no material difference in the evidence offered by the State and the evidence of the defendants themselves as to such conduct.   It appears that this building was on the west side of the street and faced east, and was immediately opposite the courthouse.   Two of the State's witnesses occupied a sleeping-room at the courthouse at that time, and were

awakened by some noise and went to their window. They saw the fire in its early stage and saw these defendants. The following is the complete testimony of one of these witnesses, Carson Craig:

"I live in Moulton. I am a civil engineer. For the past year and a half I have been working for the county. I remember the burning of the West Side Candy Kitchen. I was here in the courthouse. Falling glass first called my attention to the fact that there was a fire. I jumped up and ran to the window, the bay window. We saw something coming out of the window of the candy kitchen. The smoke was coming out of the upper part where the thin glass is just above the plate glass. I stayed there until the fire department came. After the first glass fell, another glass came out, I presume it was the plate glass. I don't know the defendants. When I first got up, I did not see anyone in the neighborhood of the fire. In a minute or two a fellow came up the street from the west, alongside of the bank building. I also saw someone come from the alley and cross the street to the other side, going in the direction of the fire department. I believe that this was before the second glass broke, and after the first one broke. When I first got up, it looked like the building was dark inside. I expect it was two or three minutes before I saw the flames. It was before the second glass fell. After the glass had fallen out, it began to be a dull glow back in there, and the longer the wait, it seemed like the closer the light would get, or the fire got, and pretty soon the flames broke out of the upper window. I don't remember whether I could see the flames or not when I saw the men. I should judge it was 3:12 when I got up.

"Cross-Examination.

"There wasn't any big flash or explosion that I saw at all. No, sir. I heard the noise of falling glass and jumped up and ran to the west window, and I saw smoke, and that was all.

I couldn't see into the building; it was dark. The smoke was coming, but no flash or flame, when I got up. And then after I stood there a minute I could see a dull glow inside like the fire was increasing in intensity, and it seemed to gradually grow brighter and brighter until I could see the flame. The bell didn't ring when I got up. I waited several minutes before anything was said about the fire alarm. Then Mr. Henderson started to send in the alarm and I hollered at him, and said there goes someone across the street running toward the fire department. Then he came back. Then we waited and continued to look at the fire. Q. Then did the fire bell ring? A. Not for some little time. Then somebody started to go to the phone to call the fire alarm, and just then the alarm sounded. All this time the fire was increasing in intensity. Getting stronger and stronger, gradually stronger. It was a gradual increase in the strength of the fire as I saw it from that window. There was nothing to prevent me getting a good view of the fire as it progressed. After the bell rang it was some little time before the wagon came, and the fire was still increasing and burning more rapidly all the time. I think the plate glass fell out after the fire bell rang but before the wagon came, and after that the fire seemed to increase in intensity with the fresh air coming in. The advance of the fire was more rapid after the window broke out, so that when the wagon got there the fire was pretty well advanced. It was a hot fire then. As to how far it extended back from the front, I don't know. If the front window was out and the back door or the back windows were open, that would leave a draft through there, through the building. As an engineer, I know that the draft and the fresh air going through there would tend to increase or advance the fire and make it more intense. The man I saw run across the street, it looked to me like he came from about where the alley is back there, he was going in the direction of the fire station. He was not walking along leisurely, he was running. And about the same time I saw a man coming east along State Street and run out

in front of this building. This man had a shirt and pants on—he was in his shirt sleeves, but his shirt tail was on the outside of his pants. It is pretty hard to describe his actions. He came round there hollering in a foreign tongue. He was hollering, but he wasn't hollering like anyone that speaks the English language. And he was folding his hands and came around there in a pretty good run when he came. He ran down in front of the building and he hollered around there for awhile, and then he started back toward State Street, and then he got back there and hollered awhile, and then went back in front again. He kept on pacing up and down there and one time he started back toward the back end, and it looked like he got almost all the way back and then he turned and came back again. All the time he was running up and back hollering. I didn't notice him squatting; he was going through so many antics there. He seemed to be very much excited. I didn't see any attempt on his part to conceal himself. I couldn't tell which one of the defendants it was. I didn't pay much attention after the wagon come.

"Re-direct Examination.

"If I remember right, the man who went across the street appeared first, but they were right close together."

The other witness, Henderson, testified substantially in accord with the foregoing. On the face of this evidence, it discloses no conduct on the part of these defendants which can be said to be inconsistent with their innocence. The theory put forward by the State is that, in so far as their conduct appears consistent, it was mere acting on their part and that it was done for the mere purpose of allaying suspicion. If it were shown by other evidence that the defendants were guilty, their conduct could, of course, be explained on the theory of the State. But the State is relying on this very conduct as evidence of the guilt, and then relies upon the fact of guilt to base an inference that the conduct itself was histrionic

rather than real. Each inference is made to rest upon the other.

Considerable stress is laid by the State upon the fact that a smell of gasoline was observable about the premises at the time of the fire, and that ten gallons of gasoline had been purchased by the defendants on the Monday previous. The testimony is undisputed that, in the operation of this business, ten gallons of gasoline per week were required. The defendants used a gasoline stove, two peanut roasters, a gasoline lighting system, and a candy machine, all of which were operated by gasoline. The gasoline obtained on Monday was so obtained in the regular course of business. Across the alley from this place of business was a pressing and cleaning establishment, in which large quantities of gasoline were used. Considerable washing in gasoline had been done in the alley by such establishment up to ten o'clock of the evening before. Even if it be assumed that the appearance of the fire at its beginning warranted a finding by the jury that it had its origin in gasoline and its gas, the circumstances here considered would fall short of showing that it was of incendiary origin.

Some stress is laid by the State upon the fact that an examination of the gas tank containing the ten gallons of gasoline obtained on Monday revealed only about an inch of gasoline left therein at the time of the discovery. According to the showing, however, this gasoline tank had been in the midst of the burning, and if all of the gasoline had disappeared therefrom, we could not see great significance in this circumstance.

The foregoing comprise the principal circumstances relied on by the State. We feel constrained to say that they are insufficient to sustain a conviction. They do not fairly meet the requirement that the circumstances as a whole must be inconsistent with the innocence of the defendants. Some of these circumstances do tend to excite grave suspicion, but we think that is the utmost that can be said for them.

In view of this conclusion, we need not consider the various specific errors assigned. The judgment of conviction must be set aside as not sufficiently supported by the evidence. The judgment is accordingly reversed.—*Reversed* and *Remanded.*

DEEMER, WEAVER and PRESTON, JJ., concur.