STATE OF IOWA, Appellee, v. GLENN WHISLER, Appellant.

No. 45862.

MAY 5, 1942.

Cosson, Stevens & Cosson and Nichols & Nichols, for appellant.

John M. Rankin, Attorney General, Jens Grothe, Assistant Attorney General, John S. Redd, County Attorney, Edward E. Eaton, and Vernon Johnson, for appellee.

HALE, J.—■ The defendant was indicted by the grand jury of Fremont county, charged with the burning of a garage building belonging to him. To the indictment he entered a plea of not guilty. At the conclusion of the State's evidence, and at the conclusion of all the evidence, motion to direct a verdict was made by the defendant, and overruled. The jury returned a verdict of guilty; defendant's motion for new trial and in arrest of judgment was overruled, and defendant was sentenced to imprisonment in the state penitentiary. Defendant appeals to this court.

The fire which the defendant is accused of starting occurred in the early morning of January 22, 1941. The garage, of which the defendant became the owner in 1935, is located in Hamburg, is 80 by 86 feet, faces south on E Street, and abuts on Park Street on the west. It is a one-story brick-and-tile building with a metal roof and has been occupied as a sales and storage garage by the defendant ever since he became the owner. There is a partition extending north and south, a little west of the center of the building. In the west room is the salesroom, with an office occupying the northeast corner of such room, and back of these are workrooms. The storage rooms are in the east part of the building. Upstairs is an attic used for a number of purposes. The fire apparently originated in the attic, a little to the east of the office. About 100 feet east of the garage and across an open space is a hatchery, also facing south on E Street. The sheriff of Fremont county and the night watchman of Hamburg were in this hatchery building from about 10:30 in the evening of January 21st, until the fire was discovered by them above the roof of the garage about 1:45 in the morning of the 22d. How they came to be there, or on what information or suggestion, the record does not disclose. No one was seen by them to enter or leave the garage after 10:30 at night. On discovering fire they gave the alarm and the sher-

iff went to the garage, found the doors locked, and entered the garage by forcing the double doors of the storage room at the vehicle entrance. The room was filled with smoke. On entering the building he saw some automobile tires on fire, just east of the office, which fire he put out with water from the hose, and he states he smelled gasoline. He then climbed the stairway to the attic and found the floor east and south of the stairway to be burned, the space so burned being nearly 6 feet long and from 1 to 2 feet wide. The fire was between the floor and the ceiling below, with the boards not entirely burned through, but part of the floor had fallen into the room below. Various things were scattered about the attic, and among them were automobile reflectors and headlights, which were found between the floor of the attic and the ceiling below. The sheriff also found some small pieces of charred rope and some broken glass near the burned space, and the top of a bottle with a wire on it and small pieces of rope attached, but the floor was not burned at the place where the glass was found. Quite a number of articles, such as inner tubes, headlights, etc., were stored in the attic. The fire was described as "a red spot on top of the garage" when first seen.

There was evidence by employees of the garage that they had seen a jug containing a light liquid in the attic, which was covered by a floor mat, several days before the fire. Also there were, or had been, other jugs, floor mats, tubes, and automobile parts scattered around, and some piled in the attic. At previous times cleaning of automobile parts had been done in that place. Other testimony was given by the fire chief, who came later, and said that he saw a fire downstairs and there was fire coming out of the roof but the only fire he could see was in the office; that he directed the firemen to put out the fire on the roof; that he was acquainted with the building, and there had been a fire in the same building several years before when the garage was operated by other owners. There was evidence of the electric wiring in the attic being poorly done, some of it merely nailed by pieces of tin to the rafters. The neon sign on the outside was still in working condition.

This is the substance of the testimony in regard to the fire itself. Other evidence will be referred to later.

The first assignment of error is failure of the trial court to sustain defendant's motion to direct a verdict for the reason that the evidence introduced upon the trial was wholly insufficient to prove the crime charged in the indictment beyond a reasonable doubt, and for the further reason that the evidence was wholly insufficient to prove the crime of arson, or in any way to implicate or connect the defendant with the commission of said crime. We have frequently held that this court may reverse a criminal case, even though having some support in the evidence, if the verdict is clearly against the weight of the evidence. State v. Carson, 185 Iowa 568, 170 N. W. 781, and cases cited.

The defendant asserts that in this case there is an absence of evidence establishing the corpus delicti beyond a reasonable doubt, and therefore that no conviction can be had. The crime with which the defendant is charged is a violation of section 12991.2, providing a penalty for any person who willfully and maliciously sets fire, or burns or causes to be burned, or who aids, counsels, or procures the burning of certain buildings, of himself or another. It must be established that the burning was willful and malicious and was not an accidental burning. State v. Millmeier, 102 Iowa 692, 72 N. W. 275. In State v. Cristani, 192 Iowa 615, 617, 185 N. W. 111, 112, the court said:

"The mere fact that the building was burned and that its origin is unknown or involved in mystery, is not evidence that it was feloniously ignited. In addition to the fact of the destruction of the building by fire, it must appear by the evidence beyond a reasonable doubt that the fire was caused by the willful act of some person criminally responsible for it. * * * In the absence of such proof, the presumption obtains that the fire was accidental, or at least that it was not of criminal origin."

The corpus delicti may be established by circumstantial evidence, but, as is the rule in all cases where circumstantial evidence is relied upon, the state of facts established must be inconsistent with any theory other than the guilt of the accused and the facts and circumstances disclosed and relied upon must be irreconcilable with the innocence of the accused in order to justify his conviction. As stated in the Cristani case:

"It is true, of course, as argued by the State, that the corpus delicti may be established by circumstantial evidence, but this does not make it the subject of mere conjecture or of doubtful inference, nor is it to be found from any combination of circumstances which may reasonably be reconciled with the theory that the fire was not of a felonious origin. Nor is it sufficient if the circumstances relied upon in support of the charge are such as excite suspicion only, but fall short of proof." (Citing cases.)

The case of State v. Millmeier, 102 Iowa 692, 72 N. W. 275, is cited by both the State and the defendant. It may be well to note what is therein said about corpus delicti (102 Iowa at page 698, 72 N. W. at page 277). The court states:

"Counsel do not agree as to what constitutes 'corpus delicti,' and we find that courts are as far apart as counsel in defining the term. The expression means, primarily, the 'body of the offense.' But, in applying it, courts and text writers have not at all times agreed as to what is meant by the 'body of the offense.' In our opinion, the term means, when applied to any particular offense, that the particular crime charged has actually been committed by some one. It is made up of two elements: First, that a certain result has been produced, as that a man has died, or a building has been burned, or a piece of property is not in the owner's possession; second, that some one is criminally responsible for the result. [Citing cases.] Applying this rule to an arson case, we held in State v. Carroll, 85 Iowa, 1, that there could be no conviction without satisfactory proof that the building was feloniously, wilfully, and maliciously burned by some one, and was not an accidental burning."

Various cases are cited by the State. The limits of an opinion will not permit an analysis of these cases, or more than a mere reference to them. In State v. Bazoukas, 226 Iowa 1385, 286 N. W. 458; State v. Traas, 230 Iowa 826, 298 N. W. 862; State v. Gates, 197 Iowa 777, 197 N. W. 908; and State v. Billberg, 229 Iowa 1208, 296 N. W. 396, the evidence was much stronger than in the case at bar.

Other cases cited are on the question of proof by circumstantial evidence about which there can be no question if

the facts warrant. We have referred to the fact that there must be malice and willfulness, and, in addition, proof that the fire was not accidental. Evidence of motive is admissible, but mere motive alone is not sufficient to support a conviction.

It will be more convenient to take up the evidence upon which the State relies to support a conviction, as shown by the State's 14 points stated at the conclusion of its argument. The State suggests in argument, and there can be no question, that each case generally must rest on its own facts so far as supporting cases are concerned. The first point of the evidence relied upon by the State is that the defendant and a young woman companion were the last to visit the garage. This was about 10:30 in the evening. About 6 or 6:30 that evening the defendant, with Miss Beam, had driven to Nebraska City, where he transacted some business with a finance company, returning to his garage in Hamburg about 9:30 o'clock. Then he and his companion went to a restaurant, and returned to the garage about 10 or 10:30 o'clock. The evidence indicates that his visits to the garage were in the usual course of business. The State also attaches considerable importance to the fact that the jug which had previously been seen in the north end of the attic was found near the south end, broken. It had a wire around the neck and a piece of rope attached, and this rope was burned. There were also several pieces of charred rope in the vicinity of the jug, but the evidence shows that these pieces of rope and other material which may be designated as "junk"—old parts, and other jugs, et cetera—were also kept in the attic. There is no direct evidence that the jug contained explosive liquid, nor as to the amount therein. Two workmen who had examined it found that it had a distinctive odor, but whether of gasoline or not we do not know. The State also claims that the charred and burned condition of the east wall of the office, located directly under the place where the broken jug was found, indicates an incendiary burning, for the reason, as the State claims, that it could have been burned only as the result of the liquid running down its surface. This might be true, but it does not establish any criminal burning, since the fire was above the office and if, as the State claims, there was an inflammable liquid there, it would naturally run down. Our attention is

called also to the fact that the tires against the partition walls on the first floor were afire and the flames were put out by the sheriff, who observed that when he played water on the tires flames were seen on the surface of the water. This, of course, would be natural if the fire was the result of burning oil or gasoline, or if the interior of the tires was burning. The State further calls attention to the reflectors containing combustible material found between loose boards and the metal ceiling north of the crossbeam near which the broken jug was found, and the pieces of charred rope there found. Whatever the so-called combustible material was—debris or broken rubber—in any event, the fire which started near it could no doubt have been communicated to these reflectors.

The State lays some stress on contradictory statements of the defendant with reference to his presence at the garage. We do not so consider them. When first asked about his presence in the garage the defendant stated that he had not been there after closing hours, and then corrected himself by stating that he was there. He first said it was 11 o'clock, and later said it was about 10 or 10:30. We see nothing contradictory in any of these statements, as the corrections were made immediately.

While the fire was in progress the defendant came, shortly after the alarm had been given, and started to go up to the attic, but was ordered out by the sheriff and directed to remain out of the building. The State argues that there were items of evidence in the attic that would establish the defendant's guilt, and that it would be unusual for an innocent man to disobey specific orders of the sheriff or fire chief and enter the building in violation of such orders, and that such conduct is not consistent with innocence. We do not think it at all unusual. It would be strange if the owner of a burning building did not attempt to go in and look, and it would not be at all unusual for him to protest orders that kept him outside of his own premises.

The next morning the defendant went to the home of one of his employees and inquired as to whether he had talked to the officers and what they had asked him, and informed the employee that, "They are trying to make it tough for me." After being barred from his premises by the sheriff, and being subjected to conduct which indicated at least an unfriendly attitude, such

inquiry would be nothing unusual or out of the way, but would be a natural question to propound to his employee. The State argues that this was the expression of a soul tortured by the consciousness of guilt. We see nothing incriminating in such an inquiry after the events of the evening.

Another point argued by the State as indicating guilt is the defendant's concern with reference to bringing cars into the garage that night. The evidence shows that this was a cold night, and that an employee, White, was requested by the defendant to see that the cars got in, although, as the State considers remarkable, this was White's night off. The directions were given to the employee before the defendant started to Nebraska City, and the State considers that the giving of explicit directions with reference to customers' cars is a damaging item of evidence. It was the usual custom, as shown by the evidence, that cars—especially those cars not known to contain antifreeze liquid—were stored in the garage at night. It had been the duty of all the employees to see that this was done. That directions were given is what might be expected of the owner of a garage, and there is nothing damaging in the fact that he reminded his employee of his duties in that respect even if the employee was familiar with the previous practice of the defendant. How this in any respect indicates guilt we do not see.

We come now to the evidence which the State considers indicates motive—that is, what is claimed by the State to be a large amount of insurance coverage. The insurance question is connected with the showing of property valuation. The State's recapitulation of the assets shows the property, including the garage building and lot, equipment, parts, accessories, cars, accounts, notes, farm property, and bank account, to be about $43,000; liabilities about $24,000, which include two mortgages on the real estate, a chattel mortgage, bank, finance company, payroll indebtedness, accounts payable, and delinquent taxes. The assets the State breaks down into capital investment $23,772.86, and assets susceptible of liquidation without replacement $19,954.56. While, as in any business, there are periods when ready money is not easily available, a man whose books show practically $20,000 excess of assets is hardly in such financial condition as to suggest a motive for the destruction of his property. The

State argues, however, that the burning of defendant's property would be more profitable than to maintain it as it then was, and shows what would be the result of a successful fire if the destruction had been complete. The State argues that the total of the insurance proceeds would be over $32,000, while the total of defendant's debts would be something over $24,000, leaving a balance of $7,000 or $8,000 after a successful fire, and, with property not destroyed amounting to $17,000, would leave the defendant with a net worth of $25,000. This difference of $5,000, however, is based upon a wrong theory of the facts and the amount of the insurance. It is shown by the evidence that there were three policies of insurance covering the garage and contents. One was a policy issued by the Hartford Insurance Company, providing for $8,000 on the garage and $5,600 on various items of machinery and stock; the second was issued by the Springfield Fire and Marine Insurance Company, for a like sum; while the third was what is called an open dealer's policy, covering only the equity of the insured in new automobiles consigned for sale. There was also a fourth policy issued by the United Hardware & Implement Mutual Insurance Company, its coverage being only against loss of profits resulting from interruption of business. It does not provide for other loss, so need not be considered. The two policies, then, the Springfield and the Hartford, are for $8,000 each on the building. There was, as usual, a great variance in the testimony of the witnesses as to the value of that building, some placing it at a much higher figure than others. One of the State's witnesses valued it at over $14,000, with a depreciation annually of 2 per cent, but we may assume, in considering this question, that $8,000 to $10,000 represents the value of the building. While each policy was for the amount of $8,000 on the building and $5,600 on contents, each had a provision that the company was not liable beyond the actual cash value. Each provided, by rider attached, that the insured might obtain other additional insurance in authorized companies. Each provided that the company was not liable under the policy for a greater proportion of loss than the "amount hereby insured shall bear to the whole amount of valid and collectible insurance covering the property." Each had attached a coinsurance clause by which

the insured was to maintain insurance to the amount of 90 per cent of the actual cash value, otherwise to become a coinsurer for the amount less than the 90 per cent, so that, under the insurance and the coinsurance clause, the insured defendant herein was practically required to insure up to 90 per cent of the actual value of the property, but neither company would be liable for any greater amount than its proportion of the actual loss. And it may be noted also that both policies were written by the Clark Insurance Agency, and at the time of the issuance of the policies, general agents of the two companies were present and examined the premises. Therefore, as we have heretofore stated, assuming that the value of the property was the minimum figure claimed by the State, there was no overinsurance, but only sufficient insurance to cover the loss, to be divided between the two companies.

Finally, the State suggests as a further circumstance, harassment of defendant by his creditors. We have examined the record and we find no creditor was pressing the defendant for payment. In the ordinary course of collection, bills were sent, but none of his creditors was pressing him for payment, and, as a matter of fact, much of the indebtedness had been reduced from time to time.

Even assuming a situation in this case such as the State argues as to insurance and financial condition—with which, however, we do not agree—we think the language of Justice Weaver in the Cristani case, supra, 192 Iowa 615, 621, 185 N. W. 111, 114, appropriate:

"That the testimony of defendant's financial status,—the condition of his business and property, as well as of his insurance,—was competent upon the question of motive, is to be admitted. It may also be admitted that, if there were other evidence of an incriminatory character, tending to show that the fire was of criminal origin, and tending in any fair degree to connect the defendant with the commission of the offense, such circumstances, with the alleged evidence of motive, might be sufficient to sustain a conviction; but the mere fact that a man is in financial straits, or is doing a losing business, and that by the commission of a crime he might hope to better his condition, is not, of itself, any evidence whatever that he is guilty

of such crime. Motive is not a crime, nor is it an essential element of crime; hence it is well settled that evidence to show motive, unsupported by incriminatory facts and circumstances, is not sufficient to make a prima-facie case of guilt. State v. Ruckman, 253 Mo. 487.''

We have gone over the record of what the State claims to be such circumstantial evidence as would require a conviction. It is impossible to do more than summarize the testimony, which is contained in two transcripts and the taking of which occupied eight days, but the main points argued are as given. We have read the record carefully, and the arguments of counsel, and we feel that nowhere in the record can there be found any circumstance or set of circumstances which would authorize a jury to render a verdict of conviction. Defendants cannot be convicted upon evidence which creates no more than a suspicion. State v. Albert, 176 Iowa 164, 157 N. W. 727; State v. Millmeier, supra, 102 Iowa 692, 698, 72 N. W. 275, 277. This case is almost entirely a question of fact, and we do not think that the facts justify submission to the jury or that they are sufficient to sustain a verdict. The motion for a directed verdict should have been sustained.

This holding and disposition of the case renders it unnecessary to consider the remaining errors urged—the ruling on the motion for a new trial, alleged errors in instructions, alleged erroneous admission of the testimony of the sheriff, or the misconduct of the jury.

Our holding must be, on the evidence in the record, that the cause should be reversed.—Reversed.

All Justices concur.