THE STATE v. FARR.

33   553
128   520

1. Criminal law: CONTINUANCE. An application for a continuance in a prosecution for murder, based on the ground of absence of a witness, and by whom it is alleged the applicant expects to prove that he, the witness, did the killing, and other facts showing that he, and not the prisoner, is the person guilty thereof, should not be overruled on the ground that it is improbable that the absent witness would subject himself to arrest by appearing before an officer and giving testimony showing his guilt of the offense charged.

2. —— PRESENCE AT COMMISSION OF OFFENSE. The mere fact that a person was in company with another, at the time of the commission of an offense by him, will not render the former guilty; his participation must in some manner be shown.

*Appeal from Mahaska District Court.*

WEDNESDAY, MARCH 27.

THE defendant is indicted for murder in the second degree, and was tried and convicted of manslaughter, and sentenced to the penitentiary for five years, from which judgment he appeals. The further facts are stated in the opinion.

*Seevers & Cutts*, and *J. A. L. Crookham* for the appellant.

*Henry O'Conner*, attorney-general, for the State.

VOL. XXXIII—70

MILLER, J. — On the 1st day of the term (February, 1871), the defendant made an application for a continuance

**1. CRIMINAL LAW: continuance.** of the cause on the ground of the absence of a witness, the brother of the defendant. The application showed that the witness was the person who shot the man of whose murder defendant is charged in the indictment; that he left the State immediately after the commission of the act, and his whereabouts has not been known to defendant, although he has made frequent and repeated efforts, and has frequently inquired of the wife of the witness, who resides in Mahaska county, and defendant has been unable to ascertain the place of residence of the witness, until within five days before making the application, he learned that the witness was on his way to Galveston, Texas, with the intention of remaining there and making that his permanent home, and that if the cause is continued he can procure the deposition of the witness by the next term of the court. Deponent expects to prove by said witness that, on the morning of the day when the murdered man was shot, the witness and deponent took their guns to go out hunting, with no thought or expectation of seeing or meeting with the deceased; that while out hunting they were passing by the mill where the deceased was at work, and that deponent commenced to talk with deceased about what deponent had heard deceased had said about deponent; that deponent and deceased got into a dispute and deceased pulled off his coat and started toward deponent, saying he would whip deponent; whereupon, A. J. Farr, the witness, shot deceased and caused his death; that there had been no talk or agreement between defendant and said A. J. Farr, about shooting, killing or injuring deceased prior to the shooting, and no conspiracy or confederation by or between witness and defendant or any other person to injure, shoot or kill deceased, and that defendant was entirely ignorant of the intentions of A. J. Farr, and had no knowledge or

thought that said A. J. Farr had any intention to shoot, kill or injure the deceased before the fatal shot was fired.

The application states that deponent believes the facts stated to be true, and that he knows of no other witness by whom the same can be fully proved, and is duly subscribed and sworn to.

This application was refused by the court and defendant excepted, and now assigns this ruling as error.

The application complied in every substantial respect with the requirements of the statute. See Rev., § 3010.

So that the court must have refused the application upon the improbability that the witness, who was the real perpetrator of the crime, would appear before an officer to give his testimony, thus exposing himself to arrest.

A majority of the court are of opinion that the court below erred in refusing the application for continuance. It fully complied with the statute, and the defendant should have had an opportunity to obtain the testimony of the witness, or at least to make an effort to obtain it, which it is clearly shown he had no opportunity to do prior to the trial. It may be reasonably taken for granted that the witness, being a brother of the defendant, will do all in his power to afford the defendant the benefit of his testimony, if he can do so with safety to himself, which it is not impossible for him to do. The court should, therefore, have continued the cause, or required the district attorney to admit that the witness, if present, would have testified as stated in the application.

The writer of this opinion prefers, however, to ground the reversal of the judgment of the district court, upon 2.——presence the entire insufficiency of the evidence, to
at commission
of offense. sustain the verdict. The evidence given on the trial is as follows:

J. M. Curry testified: I live in Oskaloosa, Iowa, and know the defendant George W. Farr; on the 22d day of March, 1870, I was working at a saw-mill in Madison

township, Mahaska county, Iowa; C. M. Rose and Henry Graham were working at the mill with me; the defendant came to the mill in the morning, between eight and nine o'clock, with his brother, A. J. Farr; the defendant had a rifle; A. J. had a shot-gun; Graham had then been at work at the mill about eighteen days; both of the Farrs had been to the mill together three or four different times previous to that day, and while Graham was working there, and I think that one or the other of them had been there nearly every day, but never knew George to have a gun with him before that day. They had been there an hour or two before I discovered any thing wrong. The first I knew there was any difficulty, Graham said: "He didn't think they had ever heard any such thing, and that it was a lie of their own getting up." The lie then passed, and Graham said he wouldn't take that from any one, and went around toward the Farr boys, pulling off his coat as he went. When he got around next to where they were standing, A. J. Farr raised his gun and shot him twice. He did not raise his gun to his face, but about on a level with his breast and fired, Graham staggered a few steps and fell, and died in a very few minutes. He had his coat partly off when he was shot; he had no weapons, and nothing in his hands. When Graham started toward the Farr boys, the defendant stood very quiet and seemed to make no preparations to defend himself, and I think had on his mittens, but am not certain. The Farr boys were six or eight feet apart, and standing nearly in front of the furnace; A. J. was standing still, with his gun by his side, and, when Graham was within a few feet of him, he raised the gun and fired, there was not time between the time he raised his gun and the time of firing the second shot for any one to interfere; after the shot they run away, taking their guns with them; I did not know that the defendant had any gun until I saw him have it when he was running away. He did not

have it in his hands during the difficulty; think it was lying or standing against a log or tree; I could hear them talking after they got into the bushes out of sight, but could not understand any thing they said. The gun was loaded with buck shot or small bullets, or it may have been with both. The mill stands near Skunk river, and, on the river bottom, was quite a place for hunting ducks and geese, and A. J. Farr had frequently been down on the bottom hunting, and it was no unusual occurrence for him to stop at the mill, and stand around an hour or two talking with those about the mill; had been there frequently and at all times of the day, and generally had his gun with him, and would stop either on his way to the place of hunting or on his way home; I noticed nothing unusual in his conduct that day, prior to the shooting; he stood around and talked as usual, but did not talk to Graham as I heard. The first that I heard that indicated any trouble, or likely to be any was, when Graham said he believed that they hadn't heard any such thing, and that it was a lie of their own getting up; the defendant then told Graham that he lied, and then Graham started toward them, pulling off his coat; Graham was as much as forty feet from them when he started; he had been at work with me at the saw a part of the time, and a part of the time had been carrying slabs from the saw around to the front of the furnace, near where the Farr boys were standing; in going toward G. W. Farr, Graham had to pass by A. J. Farr; Graham had been carrying slabs from the saw, and had been frequently passing to and fro from the saw to the furnace; the noise of the saw prevented me from hearing much of the conversation."

C. W. Rose, for the State, testified as follows: "I am 20 years old, on the 22d day of March, 1870, I was at work in the saw-mill mentioned by Mr. Curry, had been there only four days; had seen A. J. Farr there several times previous to that day, but had not seen George; they

came from a northerly direction, both had guns; A. J. always had his gun with him when there; A. J. had a double-barreled shot-gun and George had a rifle; the rifle had no trigger to it; they came in the morning and stood around near the furnace talking the most of the time with each other, in an ordinary tone of voice; didn't say much to me; I heard them talking about going a hunting or having been hunting, and, perhaps, about some other matters, but I cannot now say what.   I recollect that one of them asked me how strong I was, or if I was pretty stout, with the intention, I thought, of bantering me for a wrestle; they stood around within a few feet of me all the time; I was tending the engine and the fire, and they seemed inclined to stand near the fire; after they had been there an hour or so, Graham brought a slab from the saw around to the furnace near where they were standing; George said to Graham that he heard that he, Graham, wanted to whip him; Graham started back to his work, and, when nearly back to the saw, replied to George that he did not believe any one ever told him so, and that it was a damned lie of their own making up; A. J. Farr then told George to dare Graham out to fight; George then stepped out a few feet and told Graham that he lied; Graham then started toward him, pulling off his coat as he went, and, when he got around near to where they were, A. J. raised his gun and fired twice in quick succession, Graham staggered a few steps and fell, and died almost instantly; George had no gun in his hands, his gun was lying down, think he did not have it in his hands any of the time while there.   After the shooting, Jack started to run and told George to come; George picked up his gun and followed; I heard no words between the Farr boys about Graham, prior to the shooting, until I heard A. J. tell George to dare Graham out to fight; after that George stepped out a few feet and told Graham he lied; when Graham was coming toward them, he made no

preparation to fight, but stood quiet with his hands at his side, George was about ten feet from A. J., and Graham about the same distance from both of them when the shot was fired; after A. J. raised his gun there was not time for any one to interfere before Graham was killed; I was but a few feet from them when the shots were fired; the gun was loaded with buck shot; I did not notice that they seemed to be consulting between themselves about any thing in particular while at the mill, though they did the most of their talking to each other; they remained right around close to me and considerably in my way all the time they were there; I noticed nothing unusual in their actions or appearance; Graham had brought some slabs quite frequently around to where they were standing while they were there, and they seemed not to notice him until the time I have mentioned when the trouble commenced. After the shooting George did not start to leave until A. J. told him to go, calling to him to get his gun and come on; George did all the talking and A. J. did the shooting; A. J. never talked to Graham while at the mill or spoke to him; George commenced the conversation; the shots fired by A. J. killed Graham almost instantly."

G. W. Phillips, on part of defendant, testified: I know the defendant, and have known him about ten or twelve years; he has always sustained a good character as a quiet, peaceable person; never heard any thing against him until the present difficulty; I was a justice of the peace of Mahaska county, Iowa, on the 20th day of March, 1860, which fact the defendant knew. About 12 o'clock of that day the defendant came to my house and told me what had occurred at the saw-mill; I was called to hold an inquest upon the body of the deceased Graham, and when I left my house the defendant was still there; I live about three miles from the mill, and was the nearest justice of the peace.

John Mitchell testified that he "had known defendant

sixteen years; lived in the same neighborhood, and knew him to sustain the character of a quiet, peaceable person, never hearing any thing against him until this difficulty; also knew A. J. Farr."

Thomas Leary and Orlando Hanna each, testified : That "they were farmers and lived in the same neighborhood with defendant; were acquainted with his character and knew he had always the character of a quiet, peaceable person; never knew or heard any thing against him until the present trouble."

George Farr testified : " He is the father of defendant; that defendant is now not quite twenty years old, and A. J. is four years older than George W. and is considerably the larger and stronger of the two."

This was all the evidence, and I am of opinion that it is clearly insufficient to support the verdict.

That A. J. Farr, the perpetrator of the act, is guilty of at least manslaughter, there is no room on this evidence to doubt, but, to convict the defendant of the same crime, it must be shown that he participated in its commission. While our statute (Rev., § 4668) abolishes the distinction between principals and accessories before the fact, and makes " all concerned in the commission of a public offense, whether they directly commit the act constituting the offense, or aid and abet its commission, though not present, guilty as principals, and must be indicted, tried and punished as such." Yet, unless the defendant would be guilty either as principal or accessory, as the distinction existed at common law, he cannot be held guilty under this statute. The person who was the actual perpetrator of the crime, A. J. Farr, would, at common law, have been a principal in the first degree. A principal in the second degree is one who was present aiding and abetting the act to be done. An accessory was one who, being absent at the time of the commission of the crime, has procured, counseled or commanded another to commit the crime. See

4 Blackstone's Com., ch. 3; 1 Hale's P. C. 615; id. 616; Wharton's Am. Crim. Law, ch. 3, *Principal and Accessory.* The appellant having been present when the act was committed, if guilty at all, is so as principal and not as accessory.

To constitute a principal in the second degree, there must be a participation in the act committed, and also a presence, either actual or constructive (see same authorities). The defendant was present, but did he in any manner participate therein? Did he in any manner aid or abet the commission of the act? Any participation in a general felonious plan, provided such participation be concerted, and there be actual or constructive presence, is enough to make a man a principal in the second degree. But, although a man be present when a felony is committed, if he take no part in it, he will not be a principal, merely because he did not endeavor to prevent the commission of the crime or apprehend the criminal. Wharton's Am. Crim. Law, *supra.*

If it had been preconcerted between A. J. Farr and the defendant to go to the mill for the purpose of drawing Graham, the deceased, into a quarrel with a view of inflicting upon him some bodily injury, and the killing had resulted in pursuance of such plan, then the defendant would have been alike guilty with A. J., the perpetrator of the deed. But there is an entire absence of evidence of any previously formed design, to even quarrel with the deceased, much less to do him any injury. On the contrary, the evidence shows that the defendant and his brother were in the habit of frequently stopping at the mill when out hunting; that on this particular occasion they were there talking as usual; that there had been no previous quarrel between the deceased and either of the Farrs, and for a time after they came to the mill they paid no attention to the deceased. Indeed, it is not claimed, in argument, that there was any concerted plan between the

defendant and A. J. to injure the deceased or to do any unlawful act whatever. Then, did the defendant in any manner aid or abet A. J. Farr in the commission of the act? As we have seen, his presence alone was not sufficient. To make the defendant guilty, he must have aided or abetted, or the act must have been the result of a confederacy be- tween them, of which there is no evidence whatever.

The evidence shows that in the course of a conversation, between the defendant and the deceased, they each called the other a liar, whereupon the deceased started toward the defendant, who at the time had nothing in his hands, and, while the deceased was thus advancing, he was shot by A. J. Farr. Now this act, so far as is shown by the evidence, was entirely disconnected from, and independent of, any thing which the defendant said or did. It was apparently the independent act of A. J. Farr, without concert with any one, and not produced by the defendant's conduct, but, so far as the evidence shows, was as much a surprise to him as to any one else. It was the criminal act of A. J. Farr, without the knowledge or assent of the defendant, for which the perpetrator may be tried and punished, but not the defendant, who had no knowledge of the intended act nor assented to or aided or abetted in committing it.

The judgment must be                          Reversed.