STATE OF IOWA, Appellee, v. CECIL MICKLE, Appellant.

**WITNESSES: Privileged Communications—Waiver of Privilege.** A
1  voluntary confession of guilt, made in the presence of the attorney
   for the accused and of *other persons having no connection whatever
   with the business of said attorney,* is not privileged.

**CRIMINAL LAW: Evidence—Confessions—Other Offenses, Etc.** The
2  preliminary part of a voluntary confession is admissible along with
   the substantive part when the preliminary part traces the move-
   ments of the confessor and his confederate immediately prior to
   the commission of the crime in question, and shows their common
   criminal purpose.

**CRIMINAL LAW: Accessories Before Fact—Degree of Guilt.** Prin-
3  ciple reaffirmed that the guilt of an "aider and abettor" depends
   on the part *he* takes in the transaction in question, and not on the
   guilt of any other person.

Headnote 1: 40 Cyc. p. 2377. **Headnote 2:** 16 C. J. p. 723. **Head-
note 3:** 16 C. J. p. 131 (Anno.)

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

MARCH 10, 1925.

THE defendant Cecil Mickle was indicted on December 13,
1923, by the grand jury of Polk County, Iowa, for the crime
of murder in the first degree. He was tried, convicted, and sen-
tenced to imprisonment for life. From the judgment entered,
he appeals.—*Affirmed.*

*David Snow,* for appellant.

*Ben J. Gibson,* Attorney-general, *Neill Garrett,* Assistant
Attorney-general, and *Vernon Seeburger,* County Attorney, for
appellee.

DE GRAFF, J.—Cecil Mickle was jointly indicted with one
Jack Gaskill for the crime of murder in the first degree. The
victim of the homicide was Thomas B. Griffin, who died Novem-
ber 15, 1923, from bullet wounds inflicted, as charged in the

indictment, by the defendants. It appears from the record that the defendant Mickle and his associate Gaskill were joint · adventurers in crime. On the day of Griffin's death, they had been engaged in stripping an automobile which they had stolen the preceding night; but, before completing the job, they abandoned the enterprise, having become suspicious that their movements had been observed by a farmer residing near the scene of their activities. They returned to the city of Des Moines about 5:30 P. M., and went to the home of this defendant. At this time and place, Gaskill remarked that, as the day had not yielded them anything, they had better go down to the railroad yards and see what they could find. Thereupon, they decided to go to Gaskill's room, but changed their plan, and stopped in the alley in the rear of said room. At this time and place, Gaskill gave to Mickle an automatic revolver, which he placed in his belt. They then went down Grand Avenue to Sixteenth Street and south to the railroad tracks, where they observed some moving freight cars. Shortly thereafter, Griffin, who was an officer and special agent in the employ of the Chicago, Rock Island & Pacific Railroad Company, observed the movements of the pair. The defendant Mickle was a witness on his own behalf, and on direct examination testified:

"Gaskill was with me all the time. We were going to break into a box car down there. There was a train in motion, headed west. We were going to get on the train, and someone hollered at us. I started to run, and someone hollered and told me to stop."

Upon cross-examination, he testified that the man who "hollered" at them just wanted to know "what we were doing down there. I think he told us to get out of there. I was going to get on the box car. I was right up close to it. That is when Griffin yelled at me." In a written confession, signed and sworn to by the defendant Mickle, he stated that, when Griffiin called out, he (Mickle) reached for his gun and fired in the direction where he thought Griffin was; that he was about 20 feet from Griffin; and that Griffin was standing about 20 feet from the northwest of where Gaskill was standing. He furthermore stated that, after he fired the shot, he walked toward where Griffin was lying, and that:

"I fired three more shots into him. I was then about 3 or 4 feet away from him. It was about 7:30 P. M. when I fired the shots that killed Griffin."

The defendant Mickle upon the witness stand testified that he carried a .45-caliber automatic; while in his written confession he stated that he had a .32-caliber gun. It is shown that Griffin's death resulted from a .32-caliber bullet. Upon the trial, he further testified that, at the time he and Gaskill were about to get on the train:

"Someone hollered at us. I started to run to the south about 20 or 30 feet. I heard some firing,—several shots. Someone hollered and told me to stop. I thought it was Gaskill. He said he would shoot me if I didn't stop. When Gaskill or someone said 'stop,' I ran south. My gun was in my belt. I did not pull it out of my belt or fire it that night."

After Griffin was killed, Mickle and Gaskill went to the home of the former, where, Mickle stated, he gave his gun to Gaskill. They then went to the house of Betty Ruth, and stayed all night. She testified that they reached her house about 9 o'clock on the evening of November 15th, and that they wanted a room for the night; that they stayed there all night, and left about 8 o'clock the next morning. On the morning of the 16th, they went to Mickle's room, where they stayed until 8 o'clock that evening, when they went to a restaurant at Ninth and Grand Avenue, and had supper. It is shown that they did not sit in the front end of the restaurant, but entered through the back door, and both of them ate in the kitchen. They left the place by the back door. This is shown by the testimony of the proprietor of the restaurant. Mickle was arrested in Gaskill's room about 9 o'clock on the morning of the 21st of November, 1923.

The ingredients of the crime of murder in the first degree find ample support in the record, and the confession is corroborated in certain essentials, directly and circumstantially. There is but one question deserving of serious con-

1. WITNESSES: privileged communications: waiver of privilege.

sideration on this appeal: Was the confession a confidential communication within the meaning and purview of the statutory definition? To make answer, one must visualize the facts and understand the

relations of the parties at the time and place of the confession. The defendant was in the county jail when the confession was made, and his then attorney, A. E. Minetor, was present. The statement was dictated by the defendant to a Mrs. Berron, a. stenographer employed by the Rock Island Railroad Company, and was transcribed by her. After its transcription, the statement was signed by the defendant and acknowledged by him before a Mr. Anderson, a notary public in the employ of the railroad company. The defendant was asked, before he signed, if the statement was his voluntary act and deed, and whether he was signing of his own free will, and whether the statement was true. An affirmative answer was given by the defendant to Mr. Anderson. The notary further testified that he asked Mickle if he had read the statement, to which the defendant replied that he had. It is further shown that, during part of the time that the statement was being taken, Pat Griffin, brother of the deceased, was in the room. Under these circumstances, it may not be said that the confession constituted a privileged communication, or that it was intended to be such by the defendant when it was made. The defendant, upon the witness stand, stated that he did not give his attorney permission to use it; but the record does not show that the attorney ever used it, or that he ever disclosed or divulged its contents. The attorney was not a witness upon this trial, nor is it shown that he had anything to do with the publishing of the matters contained in the confession.

When it appears that a communication was made in the presence of a third person, it is not a privileged communication, within the purview of the statute. *State v. Swafford,* 98 Iowa 362; *State v. Sterrett,* 68 Iowa 76. In the latter case, it is held that, if .a client chooses to make a statement in the presence of other persons than his attorney and those employed in the business of the attorney, such persons are not forbidden to disclose it. The employees of the railroad company had no relation, professional or otherwise, with the attorney for the defendant. There is no claim that the confession was wrongfully obtained. It is conclusively shown that it was freely and voluntarily given. The ethics of the case are not involved; and the facts do not bring it within the provisions of the Code providing that no

practicing attorney or the stenographer or confidential clerk of such attorney who obtains information by reason of his employment shall be allowed, in giving testimony, to disclose any confidential communications properly intrusted to him in his professional capacity. Sections 11263 and 10920, Code of 1924. This is a right defined and given to the client. What is learned from him by his attorney under the conditions prescribed is a sealed book; and in no case will a lawyer be permitted, even if he should be willing to do so, to divulge any matter which has been communicated to him in professional confidence. No claim is made here that the lawyer did disclose or attempt to disclose the facts contained in the confession. They had already been divulged, and were known by persons who occupied no professional relation to the client. There was no error on the part of the court in admitting the confession in evidence.

In this connection, it is contended by appellant that certain matters found in the confession should have been excluded, as having no bearing on the crime charged, but in fact including 2. CRIMINAL LAW: matters relating to other offenses than the crime evidence: con-  charged in the indictment. Sufficient to state fessions: other offenses, etc.  that the recitals by the defendant preliminary to the confession of the killing of Griffin constituted a part of the history of the movements of the parties immediately prior to the death of Griffin. It disclosed that they were engaged in a common purpose during the day of the 14th of November, and were acting in concert of achievement on the evening of the 14th and during the day of the 15th of November. During all of this time a common enterprise was involved. It discloses criminal knowledge and intent, and a purpose to commit crime, culminating in an act of attempting to rob box cars, that resulted in the death of Griffin. This assignment of error is without merit. *State v. Wallack,* 193 Iowa 941; *State v. Maupin,* 196 Iowa 904.

Lastly, complaint is lodged against an instruction given by the trial court on the law of aiding and abetting. Apparently this instruction was given to meet all the evidence on both theories involved in the case. By the confession, 3. CRIMINAL LAW: accessories be-  the defendant admitted that he fired the shot. fore fact: degree of guilt.  Upon the trial, he denied having fired the shot.

That the defendant was acting in concert with Gaskill, there is no dispute; and under the evidence, the jury could have found, regardless of which theory it might adopt, that the defendant was legally responsible for the death of Griffin. The instruction, however, against which complaint is lodged, is not vulnerable to the objection made. The court correctly quoted the statute governing aiding and abetting in the commission of an offense, and told the jury that it was not necessary that the State should prove beyond a reasonable doubt that the defendant Mickle committed the act of killing Thomas P. Griffin with his own hand, but that it was for the jury to determine, from all the evidence and from all the facts and circumstances shown by the evidence, whether the acts done by the defendant and the conduct of the defendant constituted aiding, assisting, or abetting in the commission of the crime charged, as instructed. The trial court recognized that the guilt of a person who aids or abets another in the commission of a crime must be determined upon the facts which show his part in it, and that it does not depend upon the degree of another's guilt. The instruction embodied this thought.

Upon a careful review of the record facts, and a critical consideration of the propositions and authorities relied upon by appellant, we discover no prejudicial error. The defendant had a fair trial; the verdict is just, and the judgment entered merited; and it is—*Affirmed.*

FAVILLE, C. J., and STEVENS and VERMILION, JJ., concur.