State of Iowa, appellee, v. Aubrey W. Daves, appellant.

No. 52013.

Jerry L. Lovelace and Alan R. Leff, both of Iowa City, for appellant.

Lawrence F. Scalise, Attorney General, Don R. Bennett, Assistant Attorney General, Daniel W. Boyle, County Attorney, and Robert W. Jansen, Assistant County Attorney, of Johnson County, for appellee.

STUART, J.—Defendant was convicted of larceny in the nighttime. He has appealed from the judgment and rulings on his motion for directed verdict and motion to set aside the verdict and grant a new trial. The sole question is the sufficiency of the evidence.

On a claim of insufficient evidence to support a conviction, we view the evidence in the light most favorable to the State. The finding of guilt by the trier of fact is binding on us unless we are satisfied it is without substantial support in the evidence or is clearly against the weight thereof. State v. Stodola, 257 Iowa 863, 865, 134 N.W.2d 920, 921; State v. Poffenbarger, 247 Iowa 552, 554, 74 N.W.2d 585, 586; State v. Harless, 249 Iowa 530, 531, 532, 86 N.W.2d 210, 211; State v. Frink, 255 Iowa 59, 63, 64, 120 N.W.2d 432, 435.

However, the State must prove all essential elements of the crime charged. State v. Mabbitt, 257 Iowa 1063, 1066, 135 N.W.2d 525, 528; State v. Myers, 253 Iowa 271, 274, 111 N.W.2d 660, 662. Here the evidence shows without dispute that a Mr. Klepke took $100 from the cash drawer of the Union Bus Depot in Iowa City during the night of Sunday, March 7, or early in the morning of March 8, 1965. It is the sufficiency of the evidence connecting defendant with this crime which is

challenged. To aid or abet means to assent to an act or to lend countenance or approval either by active participation in it or by some manner encouraging it. State v. Fonza, 254 Iowa 630, 118 N.W.2d 548; State v. Smith, 248 Iowa 603, 608, 81 N.W.2d 657, 660; State v. Storms, 233 Iowa 655, 657, 10 N.W.2d 53, 54. Knowledge is an essential element of aiding and abetting. State v. Kneedy, 232 Iowa 21, 28, 3 N.W.2d 611, 615; State v. McCarty, 210 Iowa 173, 177, 230 N.W. 379, 381. Guilt of a person charged with aiding and abetting must be determined upon the facts which show his part in the crime and does not depend on another's degree of guilt. State v. Bittner, 209 Iowa 109, 111, 227 N.W. 601; State v Canalle, 206 Iowa 1169, 1177, 221 N.W. 847; State v. Smith, 100 Iowa 1, 4, 69 N.W. 269.

Mere presence at the scene of a crime is not enough to prove defendant committed the offense or that he did aid and abet its commission. State v. Mabbitt, 257 Iowa 1063, 1067, 135 N.W.2d 525, 528; State v. Farr, 33 Iowa 553, 562; State v. Fonza, 254 Iowa 630, 635, 118 N.W.2d 548, 551; State v. Farris, 189 Iowa 505, 510, 178 N.W. 361.

Any evidence, circumstantial or direct, must be sufficient to raise a fair inference of guilt. It must generate something more than suspicion, or speculation, or conjecture. State v. Myers, 253 Iowa 271, 274, 111 N.W.2d 660, 662; State v. Saling, 177 Iowa 552, 563, 159 N.W. 255, 259; State v. Whisler, 231 Iowa 1216, 1226, 3 N.W.2d 525, 530.

With these rules in mind we now turn to the evidence.

In February 1965 the operator of the bus depot reported a loss of money to the Iowa City police. When money was again missing on March 5, the police set up a plan of surveillance. On the nights of March 5, 6 and 7, officers were stationed in a bus parked along the west side of the bus depot in a position from which the interior of the station could be observed.

The depot is located in the south or rear half of the Burkley Hotel building. Two doors open from the waiting room onto an alley which runs along the south end of the building. There are three rows of six or seven chairs facing south. At the north end of the waiting room is a large opening leading into the hotel and the Campus Grill. The ticket counter in which the cash drawers

were located was also to the north end of the room. There were three rows of drawers behind the counter which were secured by placing pipes through the top of the counter and down through the drawers. They were padlocked at the bottom.

The officer, sitting in the bus, could look through a window and see the money drawers, the entire counter, the first two rows of chairs and the doors to the men's and ladies' rest rooms.

Detective Snider testified as to his observations the first night of surveillance:

"I observed the defendant, Mr. Daves, and Mr. Wells shortly after 3:00 walking through and they entered the rest room. Shortly thereafter Mr. Klepke had entered the rest room area. They were not together. They remained there a short time and Wells and Daves came out and a few steps behind was Klepke. They then left the place. I maintained my surveillance until six on the morning of the 6th, but I did not observe any of the three parties, Klepke, Daves or Wells again that morning.

"I continued my surveillance that next evening on March 6th, starting at about 9 p.m. At about 11:30, Daves, Wells and Klepke entered the bus area together and Wells and Daves sat down in the chairs in the back row. They sat in these chairs while Klepke was around in behind the counter and he dropped down and picked up a paper in the area of the coins. He was there for just a few minutes and then left. Shortly after he left, someone walked from the hotel or Campus Grill area into the rest room. During this period, Daves and Wells were seated in the chairs facing south, but Daves was looking back toward the hotel area. Wells was looking straight ahead. Mr. Klepke was over by the counter in and out pretty fast and shortly after he had left the counter area, picking up a magazine. Wells, Daves and Klepke did not appear to be conversing at all at this particular time.

"At about 1:30 on Sunday morning, March 7th, the three of them walked in. Daves stood at the north side and Wells stood at the south side of the east end of the counter. Klepke had walked past these fellows and around behind the counter to the drawers. At this time these two fellows were carrying on a conversation; one turning and listening and looking one way and the

other looking the other way and they both turned over and looked at Klepke in behind the counter at the cash drawers. Klepke was manipulating the drawers from where I could see him. They remained like this for a good ten to fifteen minutes.

"At about 3:30, the fellows entered the place again. Wells and Klepke were the only two that I noticed. Wells walking over out this door and Klepke entered in behind the counter. Klepke spent considerable time going down to the base of the drawers and up to the top and I figured he was unlocking the locks at the base of the drawers and raising the bar up. This time I thought I should move in so I left the bus and started to, enter the place to make my apprehension. As I entered, I noticed Wells standing in the southeast corner of the large room. There is a large bay window in the south wall, from which he would have complete vision of the entire parking area. I changed my mind at this point about making my apprehension and at approximately 4:00 I left the bus and called Mr. Spelman, feeling that money had been taken."

It was later determined money had been taken that night.

The surveillance on Sunday night was conducted by Officer Raymond White who testified:

"About 45 minutes after I assumed my position, I saw one fellow [Klepke] walk behind the counter. He was alone when he walked behind the counter and he had come in with two other fellows [defendant and Wells] from the hotel entrance walking into the waiting area. * * *

"Daves and Wells wandered around the area where people sit and over to the coke machine and walked around but did not sit down at that time. Mr. Klepke walked behind the counter and stooped down and picked up a pamphlet from the area underneath the counter where they are stored and stood there. and read a little bit and walked out from behind the counter. All three of them left at about 9:30, going out to the front of the hotel.

"I maintained my vigil and the same three individuals came back into the bus depot around 10:50. Wells and Daves sat in the waiting chairs for the customers and Klepke made a trip behind the counter and picked up another pamphlet. Mr. Daves

was sitting in the second chair and Mr. Wells was sitting in the third chair in a rather relaxed position. Mr. Daves was sitting kind of turned in his chair with his face turned towards the north, or towards the entrance of the hotel and Mr. Wells was sitting facing to the south. The three stayed for approximately ten minutes and during this time Mr. Klepke had picked up the pamphlet and walked back out from behind the counter and leaned against the counter and read it a while at the front of, or the south side of, the counter. Mr. Klepke then made a second trip back around the counter, picked up another larger pamphlet and walked back out. He stood there a few minutes and then the three of them left. During this time when they were in the bus depot Wells and Daves remained in their position and they talked a little bit, but I was unable to hear what they were saying as the window of the bus and the window of the building were between us.

"I continued my surveillance and noticed other people wandering through the depot periodically and around 11:15 and 12:30 there were a lot of people with buses coming and going. One of the bus drivers walked all the way through and behind the counter and a couple of others walked around to the end. None of them were near the cash drawers. At one o'clock on the morning of the 8th, all three of the fellows came back in and Mr. Klepke walked up to the end of the counter and spread a newspaper on the end so he could stand there and read the newspaper. The other two fellows wandered around just a few minutes and left by the north entrance.

"Klepke produced a screwdriver and was standing reading a newspaper and every time somebody walked by, he would be at this paper. Klepke was wearing a blue coat, black pants, white socks and brown slippers. From the inside of his coat pocket he produced a screwdriver, iron fingers and two small pieces of wire. (The witness was handed State's Exhibit No. 2) This is what is known as 'iron fingers' and is used for picking up objects from small places. They will grasp several articles and hang on to any article you want rather securely. Television technicians use them. He then proceeded to walk around behind the counter and with the screwdriver pried on the top drawer of

the right-hand series of drawers and it was visible that he was prying on the drawer and using the iron fingers.

"The counter is approximately three feet high and a six footer could lean on it comfortably with an elbow. Every time somebody walked by, he would put the stuff in his pocket and stick the screwdriver back in his shirt and hold the iron fingers beside him, appearing to be reading the paper. Sometimes he would stuff the iron fingers back in his pocket and sometimes he would just hold them down beside him. When he was standing behind the money drawer, he was pushing the steel fingers into the drawer that was out a ways. I could not actually see any money or anything leaving the drawer during this period of time. After 20 minutes, he quit coming back to the newspaper and just pulled a pamphlet out and remained standing in front of the drawer and prying. He put the screwdriver away when somebody walked by. Periodically, people would come from the front and [into] the rest room area or walk all the way through. During the first 20 minutes, Mr. Klepke would move around to this area and begin reading the newspaper, but after this, he would just stop reading the pamphlet and just hold the screwdriver alongside of him out of sight. He would do this before the people walking through came into my view and he was always over there reading the newspaper or had the screwdriver out of sight when the customers walked through. * * *

"Several people walked through there and he would either go back to the paper or would have the screwdriver hidden, by the time they got into my view. He was behind the counter for about an hour and left the building around two o'clock. At about 20 to 2, after Klepke had been there approximately 40 minutes, Daves and Wells came into sight again. At this time, Mr. Klepke was standing behind the counter and had the screwdriver in his hand. He took the screwdriver and stuck it in the drawer and pushed up against the counter and gave them both a cigarette. The screwdriver was visible over the top of the counter. He gave them a cigarette and a small piece of paper but I was unable to determine what this was. They talked for a few minutes and then left by the north entrance, going through the hotel. Klepke continued to work on the drawer until about

five minutes to 2:00. Mr. Wells then came back and walked around the corner and walked up to the counter and they both left and went into the rest room. Mr. Klepke did not have anything in his hand the second time that Mr. Wells came back. He put it back in his coat pocket and put the wires underneath his shirt before Wells came back. They were in the rest room for a minute or so and then came back out and left by the north entrance. As they walked by the coke machine, which is just to the east of the north exit, they both looked back toward the drawers and laughed about something, but I couldn't hear their remarks.

"I didn't see them the rest of the night while I continued my surveillance."

On Monday morning it was determined seven ten dollar bills and six five dollar bills, with listed serial numbers were missing. Klepke, Wells and defendant were apprehended in Iowa City between four and five Monday afternoon. They were all riding in the front seat of Klepke's car. Search revealed a screwdriver and iron fingers on the floor in the back seat. Klepke had seven ten dollar bills with serial numbers which matched those on the bills left in the drawer. Neither defendant nor Wells had any of the marked bills in their possession or cash of any kind.

The evidence is circumstantial. Can we say it is sufficient to allow the jury to find every rational hypothesis of innocence has been negatived as required by the cases? State v. Whisler, 231 Iowa 1216, 3 N.W.2d 525, 527; State v. Sigman, 220 Iowa 146, 149, 261 N.W. 538; State v. Bricker, 178 Iowa 297, 306, 307, 159 N.W. 873; State v. Vandewater, not reported in Iowa Reports, 176 N.W. 883, 884.

There is evidence from which the jury could find defendant knew Klepke was manipulating the drawers Saturday night and was in a position to see the screwdriver sticking out of the drawer Sunday night. From this it could be inferred defendant knew Klepke was attempting to get money out of the cash drawer. However, knowledge, while an element of aiding and abetting, is not enough. Cited cases hold there must be active participation in or encouragement of the act. We believe in this respect the State's case must fail.

We find no evidence from which the jury could infer defendant in any way encouraged or participated in the act. At no time while defendant was present did Klepke actually engage in the act of extracting money from the cash drawer. Defendant's conduct in the waiting room was as consistent with innocence as guilt. There is nothing in the officers' testimony from which active participation or encouragement of the act can be inferred. It is interesting to note defendant did not return to the waiting room either Sunday or Monday mornings after Klepke had apparently taken money out of the drawer. Only Wells was observed with Klepke on these occasions. The fact defendant had no money when apprehended after there had been plenty of opportunity to divide the loot also tends to negative any participation. The State apparently feels defendant was acting as a lookout stating:

"The record does not reflect, however, how far through that north entrance each or both of these men proceeded and we find it a little odd to explain how Klepke could manage to stop his operation, have the tools out of sight, and be reading a newspaper every time someone came through the north entrance into the depot going to the rest room."

This is mere speculation and does no more than create a suspicion of participation.

It appears the jury convicted defendant because of his close association with one obviously guilty of larceny rather than on proof of his participation in or encouragement of the crime charged. This is not the law. In addition to authorities previously cited see State v. Graham, 62 Iowa 108, 110, 17 N.W. 192.

The facts here are no stronger than those in State v. Fonza, supra. We feel compelled to reverse for insufficiency of the evidence.—Reversed.

THORNTON, SNELL, MOORE, MASON and RAWLINGS, JJ., concur.

LARSON, J., GARFIELD, C. J., and BECKER, J., dissent.

LARSON, J.—I respectfully dissent. In my opinion there was sufficient evidence of defendant's participation in or encouragement of the larceny committed by another to generate a jury

question as to his guilt, and the trial court committed no error in submitting that issue to the jury. Section 688.1 of the 1962 Code, which provides that all persons concerned in the commission of a public offense, whether they directly commit the act, or aid or abet its commission, are subject to criminal liability as principals, long recognized by us as applicable to lookout cases, should not be disturbed by unreasonable evidentiary requirements. State v. Berger, 121 Iowa 581, 585, 96 N.W. 1094. The question involved in such matters is whether from all the evidence and from all the facts and circumstances shown by the evidence, the acts done by the defendant and the conduct of the defendant constituted aiding, assisting or abetting in the commission of the crime charged. His guilt or innocence must be determined upon the facts and permissible inference which may be drawn therefrom tending to show his part therein. State v. Kneedy, 232 Iowa 21, 3 N.W.2d 611, and citations.

It is well established in most jurisdictions that a common purpose among two or more persons to commit a crime need not be shown by positive evidence but may be inferred from the circumstances surrounding the act and from defendant's conduct before, at the time of, and after the commitment of the act. State v. Kneedy, supra; State v. Brown, 130 Iowa 57, 62–64, 106 N.W. 379; State v. Miller, 259 Iowa 188, 199, 142 N.W.2d 394, 401.

Our sole inquiry, then, in this controversy is whether the evidence of defendant's acts and conduct was sufficient to raise an inference that he, along with another, acted as aids or lookouts for Klepke, who actually committed the larceny involved, and whether an inference of participation and encouragement was raised by his association, presence and acts at that time. In connection with this review we are reminded the evidence must be construed in a light most favorable to the State. Rule 344(f)2, Rules of Civil Procedure; State v. Miller, supra.

The evidence clearly showed the defendant, Wells and Klepke often associated at night and were observed at this time in and about the bus depot where the larceny was committed. They were seen together in the waiting room during the nights of both the 7th and 8th of March.

About 9:50 p.m. on the 7th of March a police officer observed Mr. Klepke walk behind the counter in the bus depot after he had come into the room with the defendant and Mr. Wells. He said, while Klepke obtained a pamphlet under the counter and read from it, Wells and defendant wandered around the room but did not sit down. A short time later all three left, going out the hotel entrance from which they had arrived. About 10:50 p.m. all three came back. This time "Wells and Daves sat in the waiting chairs for the customers and Klepke made a trip behind the counter and picked up another pamphlet. Mr. Daves was sitting in the second chair and Mr. Wells was sitting in the third chair * * *. Mr. Daves was sitting kind of turned in his chair with his face turned towards the north, or towards the entrance of the hotel, and Mr. Wells was sitting facing to the south." They stayed that way for approximately ten minutes, and Klepke occupied himself behind the counter and apparently read pamphlets. Daves and Wells conversed, but the witness could not hear what was said. After they left, other persons were also observed coming in and out of the waiting room, but only one bus driver went behind the counter and no one was near the cash drawers. At one o'clock in the morning Daves, Wells and Klepke returned. The latter had a newspaper which he spread on the end of the counter and appeared to read. The others wandered around "just a few minutes and left by the north entrance." Klepke produced a screwdriver, iron fingers and two small pieces of wire. He walked around behind the counter and "with the screwdriver pried on the top drawer * * * and it was visible that he was prying on the drawer and using the iron fingers." As though he had some warning, "Every time somebody walked by, he would put the stuff in his pocket * * * appearing to be reading the paper." For twenty minutes "He would do this before people walking through came into my view and he was always over there reading the newspaper or had the screwdriver out of sight when the customers walked through." Klepke was behind the counter about an hour and left about two a.m. "At about 20 to two * * * Daves and Wells came into sight again. At this time, Mr. Klepke was standing behind the counter and had the screwdriver

in his hand. He took the screwdriver and stuck it in the drawer and pushed up against the counter and gave them both a cigarette". The witness said the screwdriver was visible over the top of the counter and that Klepke also gave defendant and Wells a small piece of paper which he could not identify. He said they talked a few minutes and Daves and Wells appeared to leave by the north entrance. Wells returned shortly and he and Klepke went to the rest room, remained there a minute or so, and then left by the north entrance. None of the three returned that night. Later it was determined money was missing from the cash drawers and a search for them was instituted. Substantially, these are the material circumstances revealed surrounding the actual commitment of the criminal offense charged.

Next let us examine the testimony as to defendant's movements and relationships with Klepke and Wells prior to this occasion.

By defendant's own admission and the testimony of Wells we learn that they were roommates, living in a hotel less than a block from the bus depot, that they were friends of Klepke and were often with him at night, that he bought them coffee and some meals when they were short of money. Wells testified, "On the night of March 6th and the morning of March 7th, I'd say that I was in the bus depot. I might have been in the bus depot on the night of the 5th and 6th. Mr. Klepke was there and if I was there, Daves was. Wherever I was, Daves was generally at."

Officer Snider, of the Iowa City police force, testified he set up a watch on Friday evening, March 5th, extending into Saturday morning, that his observer called him at 3 a.m. Saturday and reported a possible suspect, and that he hurried to the scene. After he arrived at the depot he observed defendant and Wells walking through the waiting room and they went to the rest room, followed shortly by Mr. Klepke. They remained there a short time and Daves and Wells came out, and a few steps behind was Klepke. All left the area and were not seen again that night.

The next night, March 6, surveillance was commenced at 9 p.m. At about 11:30 p.m. Daves, Wells and Klepke entered the depot area together. He said Wells and Daves sat down in

the chairs in the back row while Klepke was around behind the counter in the area where the cash was kept. During this period Daves and Wells were seated in chairs facing south toward the outside door, but Daves was looking back toward the hotel area entrance. Although it did not appear that these men were conversing at the time, Klepke was always out from behind the counter when a person coming into the area from the north appeared.

At about 1:30 on Sunday morning, March 7, all three again came into the depot. Daves took a position at the north side of the east end of the counter and Wells the south side. Klepke went around the counter to where the cash drawers were located. The officer testified, "At this time these two fellows were carrying on a conversation, one turning and listening and looking one way and the other looking the other way, and they both turned over and looked at Klepke in behind the counter at the cash drawers. Klepke was manipulating the drawers from where I could see him. They remained like this for a good ten to fifteen minutes."

At about 3:30 a.m. Wells and Klepke again came in and Klepke spent considerable time working on the drawers. The officer started to enter the depot to apprehend Klepke, but changed his mind when he saw Wells "standing in the southeast corner of the large room" which had a bay window to the south. Anyone approaching the south entrance could be observed long before he entered the room itself. While defendant at that time was not seen by the officer, from Wells' admissions of their association above referred to, it seems clear the jury could find he was stationed at the north entrance protecting from a surprise visitor from that entrance. The next morning a check of the cash revealed missing marked money from the cash drawers, and another surveillance was prepared for Sunday night.

The testimony further revealed that about 1:30 a.m. on Sunday Klepke was seen getting in his car in the 100 block of South Capitol Street near the bus depot and that "Mr. Wells and Mr. Daves were with Mr. Klepke in the early morning of March 8 when they left the scene together." It further appears defendant and Wells then accompanied Klepke to Muscatine,

Iowa, to look at a wrecked car he considered buying. When they returned to Iowa City, all were apprehended in Klepke's car, and a search of the car under a previously-obtained search warrant revealed implements on the floor of the back seat of the car like those used by Klepke in the larceny at the bus depot. It is hard to believe defendant's contention that he did not know of the presence and their use by Klepke in the larceny.

At any rate it seems to me this evidence of acts, circumstances and associations before, at the time of, the crime, and thereafter, was more than sufficient to generate a jury question as to the participation of defendant in the crime charged. It created much more than mere suspicion, surmise or conjecture. If this does not support an inference of participation, the only hope for a conviction of a lookout participant is by confession or testimony of an accomplice, which under recent decisions seems to furnish little aid to the authorities in an effort to detect and convict those who aid and abet the commission of a crime.

These circumstances disclose much more than mere presence at the scene of a crime. Defendant was not an innocent bystander or one possessed of mere knowledge that another was committing a crime, which of course would be insufficient. State v. Mabbitt, 257 Iowa 1063, 1067, 135 N.W.2d 525, 528; State v. Fonza, 254 Iowa 630, 635, 118 N.W.2d 548, 551. In Fonza there was no evidence of any plan, confederacy or intent. Although here there is little direct evidence of these elements, there is ample circumstantial evidence thereof in this record. Knowledge or intent is seldom capable of direct proof, but we have often held it may be inferred from the proven surrounding circumstances. State v. Kneedy, supra, 232 Iowa 21, 28, 3 N.W.2d 611; State v. Van, 232 Iowa 34, 2 N.W.2d 748, 749, and citations; State v. Miller, supra. Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed. State v. Myers, 253 Iowa 271, 275, 111 N.W.2d 660; State v. Miller, supra; 22 C. J. S., Criminal Law, sections 87 and 88; 14 Am. Jur., Criminal Law, section 91, page 830; Wharton's Criminal Law, Volume 1, Twelfth Ed., sections 246, 256, 258.

A common purpose among two or more persons to commit

a crime need not be shown by positive evidence, but may be inferred from the circumstances surrounding the act and from defendant's conduct prior and subsequent thereto. Callies v. State, 157 Neb. 640, 61 N.W.2d 370, which cites and refers to State v. Kneedy, supra, with approval.

It is generally held, if one be outside of an enclosure watching to prevent surprise or for the purpose of keeping guard while his confederate is inside committing the felony, such constructive presence is sufficient to make him a principal. If all are engaged in a common plan for the execution of a crime, and all take part in the furtherance of a common design, all are liable as principals. In 22 C. J. S., Criminal Law, section 88(2)d, it is stated that while merely witnessing a crime, without intervention, does not make a person a party to its commission, unless his interference was a duty, or unless his noninterference was designed by him and operated as an encouragement to or protection for the perpetrator, when something is shown which indicates a design to encourage, incite, or in some manner afford aid or consent to the particular act by the bystander which will reasonably be regarded as an encouragement and protection, then a jury question as to his participation is produced. State v. Storms, 233 Iowa 655, 657, 10 N.W.2d 53.

It was not necessary, therefore, to prove that defendant actually participated in the acts constituting the offense if he watched for his companion in order to prevent surprise, the knowledge of which was calculated to give additional confidence to the actual perpetrator, Klepke. State v. Mickle, 199 Iowa 704, 202 N.W. 549. It was not necessary, as the majority seem to hold, that the State show an express agreement or understanding between these parties, nor is it necessary that a common purpose be shown by positive evidence. Its existence may and should be inferred from all the circumstances accompanying the doing of the act; in other words, preconcert or a community of purpose may be and was shown here by the circumstances.

Defendant's activities at the bus depot, and close associations shown with Klepke before, at the time of, and after, the offense, were in my view inconsistent with any other reasonable hypothesis. See State v. Miller, supra, and State v. Sigman, 220

Iowa 146, 149, 261 N.W. 538. Under the facts and circumstances revealed by this evidence, an inference of participation as a lookout was not only permissible but required jury submission. Every link in the chain necessary to raise an inference of participation was established. Some substantive proof of guilt appears, but, above all, facts were proven which tend to establish the substantive facts of active participation. In State v. Myers, supra, 253 Iowa 271, 274, 111 N.W.2d 660, we said: "But any evidence, circumstantial or direct, must be sufficient to raise a fair inference of guilt." Of course, evidence which generates nothing more than suspicion, speculation or conjecture is not sufficient, but the trial court and the jury, under unchallenged instructions, thought the evidence did meet that challenge. Although each case of this kind must be decided upon its own record, I feel that to reverse this conviction would be a repudiation of the position we carefully considered and adopted in State v. Kneedy, supra, and followed in the recent case of State v. Miller, supra.

It is only where there is a total failure of proof in a criminal case to support a material allegation in the information, or the testimony adduced is of so weak or doubtful a character that conviction thereon cannot be sustained, that a court should direct a verdict of not guilty.

Therefore, I would hold the trial court did not err in submitting the issue of participation to the jury and would affirm the conviction.

GARFIELD, C. J., and BECKER, J., join in this dissent.