STATE of Iowa, Appellee,

v.

Donald LeRoy DeRAAD, Appellant.

No. 52590.

Supreme Court of Iowa.

Jan. 14, 1969.

Martin R. Dunn, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., James C. Sell, Asst. Atty. Gen., and Ray A. Fenton, County Atty., Des Moines, for appellee.

MASON, Justice.

Donald LeRoy DeRaad seeks reversal of his conviction for murder in the second degree as defined in sections 690.1 and 690.3 of the 1966 Code. Defendant had been charged by a grand jury indictment with murdering Mary Jorgenson, alias Mary Albers, alias Mary Wilson in Polk County May 15, 1966. Following a plea of not guilty the matter proceeded to trial by jury which returned a verdict of guilty. Motion for new trial was overruled and defendant was sentenced to imprisonment in the state penitentiary for a term of 75 years.

I. Defendant first contends the evidence against him generates nothing more than mere suspicion, speculation or conjecture he committed the murder and argues the trial court erred in refusing to direct a verdict in his favor based upon insufficiency of evidence. He maintains the evidence is totally lacking in respect to proving he administered the beating which killed Mary Jorgenson.

On appeal by defendant based on claimed insufficiency of evidence to support a conviction, we view the evidence in the light most favorable to the State. The finding of guilt by the trier of fact is binding on us unless we are satisfied it is without substantial support in the evidence or is clearly against the weight thereof. State v. Frink, 255 Iowa 59, 64, 120 N.W. 2d 432, 435; State v. Stodola, 257 Iowa 863, 865–866, 134 N.W.2d 920, 921–922; State v. Daves, 259 Iowa 584, 585, 144 N. W.2d 879, 880; State v. Wimbush, 260 Iowa 1262, 1264, 150 N.W.2d 653, 654; State v. Allnutt, Iowa, 156 N.W.2d 266, 267; and State v. Anderson, Iowa, 159 N.W.2d 809, 812, and authorities cited in these opinions.

However, the State must prove all essential elements of the crime charged and mere presence at the scene of a crime is not enough to prove defendant committed the offense. State v. Daves, supra, 259 Iowa at 585–586, 144 N.W.2d at 880–881, and citations.

In State v. Frink, State v. Wimbush, both supra, and State v. Horrell, 260 Iowa

945, 948, 151 N.W.2d 526, 529, we quote this from State v. Miskell, 247 Iowa 678, 686–687, 73 N.W.2d 36, 41 :

"In a criminal action the cause should be submitted to the jury and the court should not direct a verdict of acquittal if there is any substantial evidence reasonably tending to support the charge. [Citing authorities] * * * [T]he State's evidence, with all reasonable inferences therefrom, must be taken as true and viewed in the light most favorable to the State, and it is necessary to consider only the evidence which tends to support the verdict."

▇▇▇▇ Either direct or circumstantial evidence, or both, on each and every essential element to conviction is sufficient to warrant a finding of guilty, if it satisfies triers of facts beyond a reasonable doubt. For this purpose circumstantial evidence may be equal in value to and sometimes more reliable than direct evidence. See State v. Manly, 211 Iowa 1043, 1050, 233 N.W. 110, 113, and State v. Heinz, 223 Iowa 1241, 1255, 275 N.W. 10, 19, 114 A. L.R. 959. However, where circumstantial evidence alone is relied on as to any one or more of essential elements the circumstance or circumstances must be entirely consistent with defendant's guilt and wholly inconsistent with any rational hypothesis of defendant's innocence and so convincing as to exclude a reasonable doubt that defendant was guilty of the offense charged. In support see State v. Blydenburg, 135 Iowa 264, 278–279, 112 N.W. 634, 640; State v. Hooper, 222 Iowa 481, 485, 269 N.W. 431, 433; State v. Boyle, 230 Iowa 305, 308, 297 N.W. 312, 314; and State v. Keyser, 257 Iowa 73, 79, 130 N.W.2d 701, 704, and citations in these opinions.

II. With these rules in mind we turn to the evidence in considering defendant's first assigned error.

Defendant and the murdered woman checked into the Martin Hotel in Des Moines between 9 and 10 p.m. May 14 as Mr. and Mrs. John Wilson and were escorted to room 322 by the hotel manager. About 10:30 the manager returned to the room with some ice cubes defendant had ordered. Defendant opened the door, took the bucket of ice and asked the woman with him for money to pay for the service. The manager checked the third floor at 11 p.m. and again at 1 a.m. before retiring. There were no complaints or disturbances reported to him either time.

Around midnight the hotel bellboy delivered a six-pack of beer to defendant's room. Defendant opened the door far enough to receive the beer and pay the bellboy who testified that at the time he noticed defendant's right hand was swollen but because of the position of the partially-opened door, he was not able to see anyone other than defendant in room 322 that night. About 4 a.m. May 15 as he was escorting other guests to rooms on the third floor he heard a voice come from room 322 which he described as sounding like "a child or a lady, but it was a muffled voice and kind of like someone trying to wake up or something". He also heard a male voice saying, "This is the last time now. I'm telling you this is the last time." He assumed the male voice to be defendant's.

About 10 a.m. May 15 a hotel maid went to room 322 to clean, found the door unlocked, went in and observed someone lying in the bed covered with a spread with one foot hanging out. There was blood on the pillows, on the wall and behind the bed. The manager was called, went to the room, pulled back the bedspread, observed the woman he had registered the night before. Her body had been mutilated. When he found no pulse, he locked the room and called the police.

While investigating the scene of the crime the police learned defendant was known to have kept deceased's company on several occasions for over two years. Later some of the officers proceeded to defendant's home on Merle Hay Road and

were met at the front door by defendant who said, "I've been waiting for you. I have been listening to the radio, and from the description being put out, I knew you fellows would be out here pretty soon." Defendant was advised of his constitutional rights, informed he was under arrest for the deceased's murder and asked to get dressed. As he was doing so one officer asked him for the clothing he had been wearing the night before when he checked into the Martin Hotel. This officer testified defendant denied being there but went to the closet, got a sport coat, a pair of trousers and a shirt which he said was the clothing he had been wearing and gave them to the officer. A report from the F.B.I. laboratory later revealed human blood on defendant's clothing but the type was unidentifiable. Two officers testified as to the appearance of defendant's swollen right hand.

After dressing, defendant was taken to the Martin Hotel where he was identified by the hotel manager as the man who had checked into the hotel on the evening of May 14 as John Wilson. He was then taken to the police station and booked about 3 p.m. May 15.

The Polk County medical examiner performed an autopsy, diagnosed the cause of death as a cerebral hemorrhage resulting from a severe beating and placed the time of death anywhere from 1:30 to 5 a.m. May 15. He expressed the opinion that the brain hemorrhage was of a traumatic nature of a type due to an injury, not from natural causes. The deceased woman had a fractured nose, had been badly beaten, burned with cigarettes and matches about the body and whipped in various areas of the body with a dismembered coat hanger. A more detailed description of the bruises and burns about the body would serve no useful purpose. She was identified as Mary Jorgenson.

In investigating room 322 police found beer cans with defendant's fingerprints and his fingerprint in blood on the inside of a glass. The blood type could not be determined. Various articles of bed clothing which contained blood, numerous cigarette butts of the type defendant smoked, burned matches and a coat hanger, the curved end of which matched the markings on deceased's body, were found by the officers in the hotel room.

A lady rooming across the hall from defendant in the Merle Hay residence testified she arrived home between 12 and 12:30 a.m. the morning of May 15, the door to defendant's room was open and he was not in. She did not hear defendant return to his room that night or when she got up around 8 a.m. May 15. After getting ready for work around 9 a.m. she heard defendant's bedroom door close. A little later he called to her and asked that she telephone his employer that he wouldn't be in for work that morning.

Defendant, 51, first met Mary Jorgenson in July 1964 and had known her by that name and as Mary Wilson. After seeing her May 7 at a Des Moines hotel he did not see her again until the evening of May 14 at a bar near the Lux Hotel. At the time her face was bruised and discolored. When they attempted to get a room at the Lux Hotel, the manager refused, and after purchasing some liquor and beer he and the woman went to the Martin Hotel where they registered under the name John Wilson. Defendant stayed with the woman that night but contends he left her shortly after the bellboy brought the beer, went down the stairs, didn't see either the manager or the bellboy as he went out the front door, called a cab and arrived home between 1 and 1:30 a.m.

He maintains that when he arrived home he had trouble breathing because of an asthma attack and got up and went outside two or three times in the early morning, the last time probably around 8 o'clock.

Except for denying he told the police he had not been at the Martin Hotel the night before, defendant's version of the events

following arrival of the police at his home until he was booked for murder at the police station is in substantial agreement with the State's evidence.

Defendant admitted he had been previously convicted of four felonies, denied striking Mary Jorgenson or committing the murder. He explained his swollen right hand by describing how he had dropped a hot meat pan on it a few days before while at work.

■■■ Determination of truth or falsity of defendant's statements and testimony was for the jury and it is not our province to usurp this function of passing on the credibility of witnesses. State v. Tornquist, 254 Iowa 1135, 1145, 120 N.W.2d 483, 489; State v. Olson, 260 Iowa 311, 319, 149 N.W.2d 132, 137, and citations. It is only when evidence which the trier of the fact has relied upon is inherently or patently incredible that this court will substitute its judgment for that of the fact finder. The court correctly instructed the jury that in performing its task of passing on defendant's credibility as a witness it was proper to consider his previous felony record.

■■■ The bellboy's testimony that he heard a voice coming from room 322 about 4 a.m. which he assumed to be defendant's, coupled with the testimony of the lady living across the hall from defendant in the Merle Hay residence, gives rise to a fair inference defendant was still present in the room and had not arrived home between 1 and 1:30 as he maintained, but was actually the unidentified person seen leaving the hotel about 9 a.m. May 15 by a switchboard operator.

The medical examiner's opinion the bruises on or about the victim's head were probably caused by a fist could properly be accepted by the jury as the cause of defendant's swollen hand rather than his explanation. The unexplained appearance of human blood on defendant's clothing worn

the night of the murder, his denial of being at the Martin Hotel on May 14, defendant's unexplained use of a fictitious name when registering, except to the extent that he had used the name when registering at hotels on previous occasions, and his quoted greeting of the police, supra, all furnish further support for the verdict.

This does more than generate mere suspicion, speculation or conjecture as defendant contends, it constitutes substantial evidence reasonably tending to support the charge of murder against defendant and the court properly submitted the matter to the jury. His contentions under this assignment cannot be sustained.

III. Defendant contends under his other assigned error that the sentence of 75 years was excessive in view of his life expectancy of 22.82 years.

Code section 690.3 provides:

"Whoever commits murder otherwise than as set forth in section 690.2 is guilty of murder in the second degree, and shall be punished by imprisonment in the penitentiary for life, or for a term of not less than ten years."

■■■ The trial court had the right, within the limits provided by this statute, to fix such punishment for the crime as it thought defendant deserved. Unless there is error in the sentence by reason of failure to follow a specific statutory provision or there is abuse of discretion, we do not interfere with the sentence. The judgment imposed did not exceed the statutory maximum.

■■■ Before exercising our power and authority to reduce the punishment imposed as too severe, Code section 793.18, we must carefully consider whether there has been an abuse of discretion. State v. Kulish, 260 Iowa 138, 145, 148 N.W.2d 428, 433; and State v. Cupples, 260 Iowa 1192, 1197, 152 N.W.2d 277, 280, and citation of cases in these opinions.

"The trial court and we on review should weigh and consider all pertinent matters in determining proper sentence, including the nature of the offense, the attending circumstances, defendant's age, character and propensities and chances of his reform. The courts owe a duty to the public as much as to defendant in determining a proper sentence. The punishment should fit both the crime and the individual. 24 C.J.S. Criminal Law, § 1980." State v. Cupples, supra.

Defendant was 51, had been convicted of four previous felonies and a detailed description of the woman's mutilated body was before the trial court. If there were mitigating factors, they do not appear. We find there was no abuse of discretion.

The trial court's judgment in prescribing the sentence is affirmed.

All Justices concur.